**Linda JACKSON and Thomas Miller, Plaintiffs,**

v.

**QUANEX CORPORATION, Defendant.**

Civ. No. 95–70507.

United States District Court, E.D. Michigan, Southern Division.

May 4, 1995.

George Washington, Detroit, MI, for plaintiffs.

Debra McCulloch, Detroit, MI, for defendant.

*MEMORANDUM AND ORDER DENYING QUANEX'S MOTION TO DISMISS*

COHN, District Judge.

### I.

This is a hostile work environment racial discrimination case under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Michigan's Elliott–Larsen Civil Rights Act, M.S.A. § 3.548(101) *et seq.* Plaintiffs, Linda Jackson (Jackson) and Thomas Miller (Miller), are African–American employees of defendant Quanex Corporation (Quanex), who worked at its steel tubing plant in South Lyon, Michigan. Plaintiffs allege that Quanex has actively encouraged, tolerated, and condoned a racially hostile work environment at the South Lyon plant, with the result that a small group of white employees launched a campaign of racial threats and violence against plaintiffs and all African–American employees at the South Lyon plant. Now before the Court is Quanex's motion to dismiss under Fed.R.Civ.P. 12(b)(6). For the reasons that follow, the motion will be denied.

### II.

For the purposes of this motion, the facts as alleged in the complaint are taken as true.

Miller commenced his employment at the South Lyon plant in August, 1980. Jackson was hired by Quanex in March, 1987, along with approximately thirty other African–American employees who were hired in the years 1986–87. From 1980 until 1986–87, Miller was one of three African–American employees in a plant employing approximately 400 workers. During this time, Miller complained repeatedly of racial slurs and racially threatening notes left in his locker, on his clothing, and on his property.

In the three years preceding the filing of this case, supervisors at the plant repeatedly used racial slurs and racially derogatory terms, including at least two uses of the word "nigger," and references to the plaintiffs as "lazy" and "shiftless." In October, 1994, white employees in the west end of the plant left a dead animal on the machine of an African–American employee recently transferred into the area, and later drew graffiti referring to the dead animal. On November 5, 1994, a white employee physically assaulted Jackson at the plant. When Jackson complained of a what she considered a racial

assault, management suspended both her and her assaulter for three days, offering to reinstate Jackson if she apologized to her assaulter. On December 2, 1994, the same employee who had assaulted Jackson, and another employee who had previously made open use of racial slurs, falsely and maliciously accused Jackson of taking pictures within the plant. Jackson complained that this was another incident of racial harassment, but management took no action other than to investigate Jackson for potential discipline. Out of fear for her physical safety and employment security, Jackson took medical leave on December 5, 1994.

On December 8, 1994, when other employees learned of Jackson's taking leave, the employee who had assaulted her walked into the plant wearing a swastika on his hard hat. Representatives of the employees' union asked him to remove the Swastika, but Quanex took no action against him for displaying the racially charged symbol. On repeated other occasions, supervisors and co-employees have spoken racial slurs, written racial graffiti, and engaged in other threatening and intimidating conduct. As a result of the climate of racial hostility in the plant, Miller has taken medical leave based on his fear and emotional pain and suffering.

Though it is not mentioned in the complaint, it is undisputed that plaintiffs are members of the International Union United Steelworkers of America AFL–CIO–CLC Local Union 1900 (United Steelworkers), and worked for Quanex under the terms of a collective bargaining agreement (CBA). Article II, § 8 of the CBA states in part:

> It is the continuing policy of the Company and the Union that the provisions of this Agreement shall be applied to all employees without regard to race....

Section 9 of the Article continues:

> The Company will recognize a Civil Rights Committee composed of three (3) Union Members, who shall be employees of the Company. Matters involving noncompliance of this section will be subject to discussion between the Civil Rights Committee and Management Representatives. If not resolved, a grievance may be presented at the Third Step of the grievance procedure.

The CBA makes available an internal Civil Rights Committee and the grievance procedure for violations of civil rights. The final step of the grievance procedure in appeal to an arbitrator under Article XI, Section 1, D:

**D. Step 4**

> Upon receipt of the appeal of the grievance to an impartial arbitrator the parties will send a letter to the Federal Mediation Conciliation Service requesting that it forward a list of ... recommended arbitrators.

> \*    \*    \*    \*    \*    \*

> Actual hearing of the case must be arranged within thirty (30) days from notification by the Union of its intent to submit the case to arbitration. The decision of the arbitrator will be final and binding on both parties; however, he shall not have the authority to add or to subtract from language of the contract.

### III.

The complaint contains two counts, both premised on the racially discriminatory acts which created a hostile racial environment. The first count is based on 42 U.S.C. § 1981, and the second on the Elliott–Larsen Civil Rights Act, MSA § 3.548(101) *et seq.* Plaintiffs seek monetary damages, costs, and attorney's fees.

### IV.

#### A.

■ Quanex has moved to dismiss on the grounds that the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.*, requires plaintiffs to litigate their statutory claims in arbitration, under the terms of the CBA, and because Michigan favors arbitration as a dispute resolution mechanism. Quanex grossly misconstrues both the FAA and the precedents interpreting the Act.

Section 2 of the FAA provides in part:

> [W]ritten provision(s) in ... a contract evidencing a transaction *involving commerce* to settle by arbitration a controversy thereafter arising out of such contract

or transaction, ... shall be valid, irrevocable, and enforceable, save upon such ground as exist at law or in equity for the revocation of any contract.

(emphasis added). Section 1 provides in part:

[C]ommerce, as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, *but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers employed in foreign or interstate commerce.*

(emphasis added).

Quanex relies on the Supreme Court's opinion in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and several lower court opinions following *Gilmer*, for the proposition that even federal statutory claims of discrimination may be subjected to compulsory arbitration under the FAA. *Gilmer* marked a significant expansion of the scope of the FAA. Prior to *Gilmer*, federal courts had exhibited a reluctance to force arbitration of employment discrimination cases. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 39, 94 S.Ct. 1011, 1015, 39 L.Ed.2d 147 (expressing mistrust of the arbitral process for resolving statutory claims). *Gilmer* characterized this mistrust of the arbitral process as outmoded, and found that the plaintiff's claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, could be subject to compulsory arbitration pursuant to an arbitration agreement in an application for securities employment registration and the FAA. 500 U.S. at 34–35, 111 S.Ct. at 1656.

Quanex's reliance of *Gilmer* fails to take into account the important circumstance that the arbitration clause it seeks to enforce is contained in a CBA. In deciding *Gilmer*, the Supreme Court did not overrule *Gardner–Denver*, but specifically distinguished it.

One of the grounds on which the Supreme Court distinguished *Gardner–Denver* and its progeny—*Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); and *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)—was that those cases, unlike *Gilmer*, involved arbitration under a collective bargaining agreement, implicating

the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, the potential disparity in interests between a union and an employee, and the limited authority and power of labor arbitrators.

*Gilmer*, 500 U.S. at 35, 111 S.Ct. at 1657.

Here, unlike *Gilmer* and unlike any of the lower court opinions cited by Quanex, Quanex seeks to force plaintiffs into arbitration of statutory claims under the terms of a collective bargaining agreement. After *Gilmer*, the Court of Appeals for the Sixth Circuit explicitly stated that "collective bargaining agreements are 'contracts of employment' and therefore outside the scope of the FAA," *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 311 (6th Cir.1991) (citing *Bacashihua v. USPS*, 859 F.2d 402, 404–06 (6th Cir.1988) (finding collective bargaining agreements are "contracts of employment" within the meaning of § 1 of the FAA and thus excluded from the coverage of the Act)).

■ Quanex tries to avoid the FAA's § 1 exemption of employment contracts by relying on cases from the Court of Appeals for the Seventh Circuit, and several other Circuits, holding that the exemption only applies to workers directly and actively employed in the transportation industries. *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985). While Quanex correctly recites the law of the Seventh and several other Circuits, that approach has been rejected by the Sixth Circuit. The Sixth Circuit, in *Willis*, declined to adopt a narrow reading of the § 1 exclusion, finding that the "employed in foreign or interstate commerce" language in § 1, like the language in § 2 of

the FAA, was meant to be coextensive with the scope of congressional power to regulate under the Commerce Clause.[1] 948 F.2d at 310–311. Thus, in the Sixth Circuit, § 1 of the FAA exempts from the Act's coverage "contracts of employment of ... any ... class of workers employed in ... interstate commerce," under the broadest constitutional meaning of the phrase "interstate commerce." 9 U.S.C. § 1.

In addition, while Quanex correctly notes that a number of courts have found Title VII claims, as a general matter, to be subject to compulsory arbitration under the FAA, none of the cases it cites are in the context of an arbitration clause in a CBA. Rather, the authorities cited by Quanex, including those not followed by the Sixth Circuit, all involve plaintiffs who signed individual agreements compelling arbitration, particularly in the context of registering to broker securities. *See, e.g., Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698 (11th Cir.1992); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305 (6th Cir.1991); *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir.1991). None of these cases, nor *Gilmer*, compel arbitration of civil rights claims under the FAA pursuant to an arbitration clause in a CBA. Rather, in the case of an attempt to compel arbitration of a civil rights claim under a CBA, *Gardner–Denver* remains squarely on point.

Under *Gardner–Denver*, union members may not be compelled to submit constitutional and statutory civil rights claims to the labor arbitration process. *Gardner–Denver*, 415 U.S. at 60, n. 21, 94 S.Ct. at 1025, n. 21. This result is appropriate even after *Gilmer* because of the unique character of labor arbitration. As the Supreme Court noted in *Gardner–Denver*, in labor arbitration the un-

ion has exclusive control over the extent to which an individual grievance is presented, the interest of the individual employee may be subordinated to the perceived greater interest of the bargaining unit, "harmony of interest" between the individual employee and the union cannot be assumed, and a breach of the union's duty of fair representation may be difficult to prove. *Id.* at 58, n. 19, 94 S.Ct. at 1024, n. 19. In short, the labor arbitration process places significantly less emphasis on the rights of individual employees than do the civil rights statutes, rendering mandatory labor arbitration of civil rights claims inappropriate.

Simply put, the Court declines to find that United Steelworkers bargained away a member's right to have a statutory civil rights claim decided in a courtroom.[2] Plaintiffs are not required to arbitrate their statutory claims under the terms of the CBA.

### B.

■ Quanex also argues that plaintiffs should be compelled to arbitrate their Elliott–Larsen claim under *Heurtebise v. Reliable Business Computers, Inc.*, 207 Mich. App. 308, 523 N.W.2d 904 (1994). *Heurtebise* relied on *Gilmer* in holding that the plaintiff could be compelled, under the terms of her individual employment contract, to pursue her Elliott–Larsen claim in arbitration. Putting aside the decision's inconsistency with *Willis, Heurtebise* simply does not address the case of an employment contract in the form of a CBA. As is discussed above, CBA's implicate a set of concerns distinct to labor arbitration and not involved in individual employment contracts.[3] *Gilmer*, 500 U.S. at 35, 111 S.Ct. at 1656. For the reasons discussed above, plaintiffs are not required to

---

1. Quanex mischaracterizes *Bacashihua* in suggesting the case adopts the narrow reading of the "engaged in ... interstate commerce" favored by the Seventh Circuit. In *Bacashihua* the Court did not find it necessary to explore the boundaries of the § 1 exemption, because as an employee of the United States Postal Service the plaintiff clearly belonged to a class of workers engaged in interstate commerce under any definition of the term. 859 F.2d at 405 ("If any class of workers in engaged in interstate commerce, it is postal workers.")

2. Though it is not dispositive, the Court suspects United Steelworker's negotiators would be as surprised as the Court to learn that they had bargained away a member's right to bring a civil rights claim in court.

3. *Prudential Ins. Co. of America v. Shammas*, 865 F.Supp. 429 (W.D.Mich.1993), also cited by Quanex, similarly does not involve a CBA, but rather the same securities registration form interpreted in *Gilmer*.

litigate their Elliott–Larsen claims in arbitration under the terms of the CBA.

### V.

For the reasons stated, Quanex's motion to dismiss is DENIED.

SO ORDERED.